**UNITED STATES of America,**

v.

**Raymond J. GONZALEZ, Defendant.**

**Crim. No. 79–326.**

United States District Court,
D. New Jersey.

July 12, 1983.

W. Hunt Dumont, Esq., U.S. Atty. by Asst. U.S. Attys., Anne C. Singer, Andrew Ruotolo, and Jerome Ballarotta, Newark, N.J., for the United States.

John F. McMahon, Federal Public Defender by Michael N. Pedicini, Deputy Public Defender, Newark, N.J., for defendant.

## MEMORANDUM

BIUNNO, Senior District Judge.

The disposition in *U.S. v. Bazzano* (Appeal of Mollica) 712 F.2d 826 (1983) (en banc), has resolved the questions which have prevented the processing of the violation of probation charges in this case.

As all who are familiar with the history know, a panel decision was filed May 12, 1982 and then vacated on June 17, 1982. A new panel opinion was filed July 7, 1982, and then vacated August 10, 1982 on grant that day of petition for rehearing en banc. Reargument was on November 8, 1982 and the opinion was filed June 17, 1983.

The trial judge in *Bazzano* was faced with a number of questions, the first of which was whether a valid order revoking probation could be entered after the maximum statutory period of 5 years' probation had expired, when the probationer is arrested, or formal proceedings for revocation are begun without arrest, within the probation period, see 18 U.S.C. § 3651, § 3653. On this point, the court en banc was unanimous in deciding that so long as the arrest or formal proceedings begin while the party is still on probation, an order of revocation may be entered after the time has expired. See per curiam opinion, II, and opinion of Judge Garth, II.

■ This unanimity on the point is not surprising, since a probationer who violates probation stops earning credit for time on probation when the violation occurs even though some time may inevitably pass before the occurrence of the violation is discovered and formal proceedings begun, heard and decided. See *United States v.*

resolution of this matter, however, renders un-

necessary a decision on the motion to strike.

*Lancer,* 508 F.2d 719 (CA–3, 1975) (en banc), cert. den. 421 U.S. 989, 95 S.Ct. 1992, 44 L.Ed.2d 478 (1975).

■ In the present case, no such problem exists because formal proceedings were begun well within the period of probation, based on new state charges for violation of the law.

Both earlier panel opinions, filed May 12, 1982 and July 7, 1982, expressed the view that since the initiation of revocation proceedings during the probation period assures the continuance of jurisdiction to support hearing, decision and revocation after the probation period would *otherwise* have expired, the trial courts should ordinarily postpone the hearing until after the trial of the new charges had been completed, subject to some exceptions given for illustration. This policy was indicated to be in exercise of the supervisory power of the Court of Appeals.

Whatever significance the point had then arose from the fact that to proceed with the probation revocation hearings before trial on the new charges put Mollica in a dilemma. If he testified at the hearings, what he said might be used against him at trial on the new charges later. If he protected his future trial position by not testifying at the probation hearing, he might weaken his position on revocation.

It was because of this dilemma that the first two panel opinions sought a solution by calling for postponement of the hearings as the course of choice, and, if other considerations precluded postponement, then the trial court was to fashion and grant a limited testimonial use immunity on the principles developed in *Government of Virgin Islands v. Smith,* 615 F.2d 964 (CA–3, 1980).

The final decision of the en banc court left the trial court judgment on this pair of alternatives undisturbed for lack of a majority on appeal. There seem to be four formulations, adhered to by 1, 2, 3 and 4 members, with none commanding 6 votes.

This sharp division might ordinarily imply that there are slippery slopes in every direction, but this is not so. The division does mean that there is no rule laid down under the court's supervisory power. Had there been one, trial courts within the Circuit would be obliged to adhere to and follow it. Since there is none, each case will be dealt with on the basis of the totality of its own facts and the totality of the circumstances.

In the present case, probationer Gonzalez was tried in state court on the new charges and the jury returned a verdict of guilty on May 20, 1982. At the several appearances so far the court has been informed of this, as well as of the fact that Gonzalez testified at his trial. However, there is no judgment of conviction because sentence has not yet been imposed.

The reason, as the court is told, is that after verdict and before sentence Gonzalez moved for a new trial and that motion has not been decided because the trial transcript has not been typed.

Had there been a judgment of conviction, of course, proof of its entry and of the identity of the probationer as the convicted defendant would be all that would be required for a probation violation hearing since Gonzalez could not collaterally attack that judgment here, *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

■ Since there is not a judgment of conviction, the proceeding can only go forward by having evidence submitted at a hearing before the court, pro and con, so that a decision can be made here on the charge of violation without the benefit of any judgment from the state court, and, from what seems inevitable though beyond understanding, without the benefit of the trial transcript there.

The dilemma that Mollica based his argument on does not exist here. Gonzalez has been tried and he testified at his trial. Even if he had been acquitted, that would not result in automatic dismissal of the violation charges here, because an acquittal implies no more than that the fact-finder harbored a reasonable doubt, the Govern-

ment has a lesser burden of proof in revocation proceedings, *U.S. v. Manuszak*, 532 F.2d 311 (CA–3, 1976), and except for matters of privilege, the Federal Evidence Rules do not apply, see Rule 1101(d)(3). In fact, it appears that before the en banc decision in *Bazzano*, Mollica secured an order suppressing evidence on the new charges, and further prosecution was dropped, but the revocation stood.

Further postponement in these circumstances is undesirable from all points of view. Formal proceedings having been initiated, Gonzalez cannot be certain that he will ever receive credit for the elapsed time since the occurrence of the event underlying the charges which go back at least to October 3, 1981. The verdict may be set aside and a new trial granted with further inevitable delay. Memories may fade and witnesses may become more difficult to find. Randomness of such developments can disadvantage either side, both sides, and in any event degrade the fact-finding function.

The nature of probation is such that charges of violation of conditions should be dealt with expeditiously. As rapidly as is consistent with the process due to a probationer, both he and the public are entitled to know whether he may be allowed "to live in society without committing additional antisocial acts", see *Morrissey v. Brewer*, 408 US 471, at 473, 92 S.Ct. 2593, at 2596, 33 L.Ed.2d 484 (1972). This does not mean that every violation of the conditions of probation automatically leads to revocation and to prison. There are minor infractions that do not warrant that course, but do call for some lesser sanction or change of conditions instead. The role and functions of a probationary sentence are mainly shaped by the object to induce a prisoner to modify his responses to temptations, and to build strengths where there is weakness. Delay in disposition is quite inconsistent with that object.

As observed by Judge Adams in his dissent in *Bazzano*, 712 F.2d 826 at 851 (CA–3, 1983) the recent decision in *Pillsbury Co. v. Conboy*, —— U.S. —— at ——, 103 S.Ct.

608 at 612, 74 L.Ed.2d 430 at 440, footnote 13, stating that "District Courts are without power to compel a civil deponent to testify over a valid assertion of his Fifth Amendment right, absent a separate grant of immunity pursuant to § 6002" casts doubt on the decision in *Government of Virgin Islands v. Smith*, 615 F.2d 964, at 972 (CA–3, 1980) and the grant of a judicially fashioned immunity. This point may not be of significance here if it be shown, as the court is informed, that Gonzalez took the stand, and testified at his trial in Pennsylvania, but the parties will need to present their views in that regard.

For each and all of the foregoing reasons, the court is of the view that the United States should now undertake to gather and produce those witnesses it believes it needs to establish the truth of the charge, and to inform the court of a date by which it expects to be able to proceed. If either side has objections to this course, they will be heard on the continued date now set for July 18, 1983.

## ADDENDUM

### October 17, 1983

An evidentiary hearing was conducted before the court, with the United States producing evidence that Gonzalez had briefly visited Frederick Werner, the retail supplier of methamphetamine to the undercover informant, Gregory Keller, on three occasions. On each occasion, Keller was told to leave and either come back a specified time later, or to wait for a phone call from Werner that was in fact made a short time later. Keller was told each time that Werner had to replenish his supply.

Werner's home was under surveillance, and on each occasion that Keller entered he was first searched by government agents, and then searched again after leaving to establish what he had in his possession. On his first visit for each date, he had cash, given to him for the purchase, going in and did not have it when he left; and on his second visit, had no CDS in his possession going in, and did have when he came out.

On one of the three occasions, a pen register was connected to Werner's phone and it recorded the dialing of a call from Werner's phone to Gonzalez's phone very briefly after Keller left Werner's. On another occasion, the agent supervising Keller answered Keller's phone when Werner phoned to tell Keller to come for the CDS.

On all 3 occasions, Gonzalez was observed arriving at, entering, and later leaving Werner's home between Keller's departure on his first visit (having left the money) and his return on the second visit (to pick up the CDS). A number of sequential still photos verified the oral testimony.

The defendant called Werner as a witness. Werner had also been charged in Pennsylvania but had negotiated a plea agreement and was not tried with Gonzalez. He testified that Gonzalez never supplied him with CDS, and ascribed wholly innocent purposes to the three occasions on which the charges focused. He also described Keller as an untrustworthy drug addict. He admitted supplying Keller on the three occasions and on others as well, and said he didn't trust Keller and for that reason told him to leave and come back, although it was not necessary since he had methamphetamine on hand. He also said that on each purchase, after weighing the amount on the scale, Keller took some of it out to put in a separate container, replacing its volume or weight by approximation by adding common materials he found in Werner's kitchen. He said Keller would leave these personal packets by the front door and come back for them later.

He was present in the courtroom during Gonzalez's trial in Pennsylvania and heard the evidence implicating him in these three dealings, but did not come forward to offer the exonerating testimony given before the court here. His explanation is that he did not want to run the risk of losing the benefit of his own plea agreement, the plea having not yet been entered and sentence not imposed.

Gonzalez also testified, denying the inculpatory aspects (though he could not deny the visits to Werner's home), giving the same explanation of harmless or innocent purpose that Werner had, namely, that he had agreed to go into the business of an "adult" bookstore with Werner, putting up $5,000 from the business he was in with his brothers, with their reluctant consent. When the bookstore did not materialize, and Werner could not return the funds, the Gonzalez brothers told defendant to obtain security, and Werner provided him with a quantity of jewelry worth much more, to hold in pledge. This jewelry was held by one of the brothers. The visits to Werner's were either to mark a birthday of Mrs. Gonzalez, or to go to pick up a payment on account toward the $5,000. in response to a call from Werner that he had cash for that purpose. On an occasion when photos were taken, the paper bag contained jewelry he was returning, he said, and Werner said he used the same bag to give Keller his CDS.

Gonzalez's brother also testified to confirm that the siblings had agreed, though reluctant, to the $5,000 investment in the bookshop, insisted on the security, and held the jewelry physically, returning it roughly one-half at each time as half the money was repaid.

The Court's findings, from the bench, were that the United States had established the violations on the three dates.

These findings turned mainly on credibility, the reasons being explained orally on the record, and included the fact that at this hearing Gonzalez testified in direct contradiction of two items about which he made statements under oath during allocution for his tendered guilty plea on the original charge here. During that allocution, he said that co-defendant Dones had telephoned him from Florida to ask him to drive from Bethlehem, Pa., to Newark Airport, to pick up Dones with a suitcase of illegal pills and take him to a motel in Newark, and that he had asked Vasquez, another co-defendant to come along for company without disclosing the purpose of the trip. This statement was accepted by the United States as a basis for dismissing the charges against Vasquez. At the hear-

ing on probation violation, he said that it was Vasquez who had made the arrangements and that he, Gonzalez, knew nothing of the purpose and had been asked to go along for the ride.

At the plea allocution, he also said no one had instructed him about what to say at the allocution and that his answers were true. At the probation violation hearing he said that Dones' lawyer (not a member of the bar of this court) had told him what to say.

Aside from other rather obvious implications, these at least amount to clear-cut instances of past contradictory statements going to credibility. The transcript of the plea allocution is part of the official record in this same case, and the pertinent passages were read at the hearing, while Gonzalez was on the stand but he provided no credible explanation.

His credibility as well as that of Werner was adversely affected by the felony convictions of both, Werner's being by plea of guilty in connection with the same activities for which Gonzalez was tried in Pennsylvania, and Gonzalez's being on the plea of guilty to the original charges against him in this case.

Werner's credibility was also adversely affected by his admission (which he denied making) to the government agent who testified here, that he had purchased methamphetamine from Gonzalez on one occasion.

After the oral findings were made at the close of the hearing, a separate and later date was set to decide what consequence should follow, and after hearing that aspect, the decision was to revoke probation and reduce the sentence previously imposed (5 years) and impose a lesser one (4 years), based on the original charge here and not on the Pennsylvania charges which were merely the basis for probation revocation.

The court expressly did not and could not consider the verdict of the Pennsylvania jury, and what consequences may ensue from that verdict, or from a new trial if one be granted, is a matter for the Pennsylvania court and of no significance here.